2940.  SPARKS MILLING CO. *v.* WESTERN UNION TELEGRAPH CO.

1. The damages sought to be recovered were not caused by the alleged negligent conduct of the defendant telegraph company, but resulted from the voluntary act of the plaintiff in complying with the terms of a proposal or offer to contract, which it had not accepted, and which it was under no legal compulsion to perform.
2. In a suit for special damages alone, where the plaintiff is not entitled to recover the special damages sued for, there can be no recovery of general or nominal damages.

DECIDED JUNE 29, 1911.  REHEARING DENIED SEPTEMBER 28, 1911.

Action for damages; from city court of Atlanta—Judge Reid. September 17, 1911.

The Sparks Milling Company brought suit against the Western Union Telegraph Company for damages growing out of the alleged negligent conduct of the defendant in the transmission and delivery of certain cablegrams.  A general demurrer to the petition was sustained, and this judgment is here for review.  The allegations of

the petition, are substantially as follows:  The Sparks Milling Company is a corporation manufacturing and selling flour.  Ross T. Smyth & Co. represented it in Liverpool.  On August 16, 1907, it had two separate negotiations with Smyth & Co. by cipher cablegrams over the lines of the defendant.  The first cablegram related to what was known as "Armadale" flour, and was sent by the milling company to Smyth & Co.  It was as follows:  "Best offer we can make is:  We offer to sell you one thousand 140 lb. sacks Armadale at 22 shillings."  On the same day a reply was received, as follows:  "We accept your offer of one thousand 140 lb. sacks Armadale at 22 shillings."  On receiving this acceptance the milling company cabled to Smyth & Co. the following:  "We confirm sale [referring to the sale already completed of one thousand 140 lb. sacks Armadale at 22 shillings] and offer you 1,000 more at a third advance."  The last cablegram was not delivered to Smyth & Co. until the following day,—August 17.  Between the sending of this last cablegram and its receipt, Smyth & Co. opened negotiations as to the second transaction, by sending to the milling company the following cablegram:  "We offer to buy of you 3,000 sacks weighing 140 lbs. Sparks' Best, at 23-6 shillings per sack, September and October shipment."  This offer was not accepted, but a counter proposition was cabled to Smyth & Co. as follows:  "We offer to sell you 3,000 sacks weighing 140 lbs. each of Sparks' Best at 24 shillings per sack.  We offer to sell you 3,000 sacks, 140 lbs. each, of Yarrow flour at 23-6 shillings per sack, all September shipment."  This cablegram was never delivered.  It is alleged that Smyth & Co., receiving no response to their "Sparks' Best" cablegram, necessarily construed the third cablegram relating to the "Armadale" transaction as referring to their offer by cablegram to purchase 3,000 sacks of "Sparks' Best," and as an acceptance of that offer; that if they had received the third cablegram, relating to the "Armadale" transaction, within a reasonable time,—to wit, on the day on which it was sent,—they would necessarily have interpreted it as meaning that the milling company was offering an additional 1,000 sacks of "Armadale," weighing 140 pounds each, at 22 1/3 shillings; that not receiving this cablegram within a reasonable time, and receiving no response to their offer to purchase 3,000 sacks of "Sparks' Best," and construing the third cablegram relating to the "Armadale" transac-

tion as an acceptance of their offer with reference to "Sparks' Best," they resold the 3,000 sacks of "Sparks' Best," and insisted that the milling company was bound to deliver the 3,000 sacks of "Sparks' Best" at 23-6 shillings; and the milling company, considering itself bound to deliver this flour in accordance with an apparently closed transaction as hereinbefore stated, and, in the exercise of good faith and with a view to preserving its credit and protecting its good name in the business world, carried out the trade and delivered the 3,000 sacks of "Sparks' Best," on the terms contained in the offer made by Smyth & Co.; and, to do so, it was compelled to purchase in the open market 3,000 sacks, weighing 140 pounds each, of "Sparks' Best," at an advance of three shillings per sack; resulting in a loss of $1,080; for which sum the suit was brought.

*Payne, Little & Jones,* for plaintiff.

*Dorsey, Brewster, Howell & Heyman,* for defendant.

HILL, C. J. (After stating the case.)

1. The judgment dismissing the petition on general demurrer must be affirmed. Conceding the negligence of the defendant company as alleged, the damage to the plaintiff, nevertheless, did not result from the negligence, but was due to the voluntary act of the plaintiff in complying with the unauthorized demand of Smyth & Co., resulting from an inexcusable error of the latter in interpreting the third cablegram (which by its express terms applied only to the "Armadale" transaction, and which transaction had been entirely closed by the two previous cablegrams,—the offer made by the milling company and its acceptance by Smyth & Co.) as referring to the cablegram offering to purchase 3,000 sacks of "Sparks' Best" at 23-6 shillings per sack, and as being an acceptance of the offer. The alleged delay in delivering the confirmatory cablegram referring to the "Armadale" flour transaction can not reasonably be considered as forming the basis of any claim for damages in connection with the "Sparks' Best" flour transaction. This cablegram could not have been reasonably construed as referring to the "Sparks' Best" flour transaction, or as a reply to the proposition to buy "Sparks' Best" flour, contained in the cablegram of Smyth & Co.; for the very simple reason that the confirmatory cablegram by its terms referred to the "Armadale" transaction, confirming the sale theretofore made of the 1,000 sacks of "Armadale"

flour and offering to sell 1,000 more sacks at a third advance.
When Smyth & Co. construed this confirmatory cablegram as
relating to 3,000 sacks of "Sparks' Best" flour, they made an un-
reasonable and inexcusable error, and this erroneous interpretation
was in no sense binding upon the milling company; and if the mill-
ing company, for the purpose of protecting its credit, accepted this
erroneous construction, it was its voluntary act; for it was not
legally bound to sell the 3,000 sacks of "Sparks' Best" flour to
Smyth & Co. at the price offered by them. It had expressly declined
this offer and had made a counter proposition, and, while the cable-
gram containing this counter proposition may not have been de-
livered, it is indisputably shown that there was not, in law, a
contract between the milling company and Smyth & Co. in refer-
ence to the "Sparks' Best" flour. Now, unless the milling com-
pany was bound by a valid contract to sell to Smyth & Co. "Sparks'
Best" flour, on the terms proposed in the cablegram, there could
not be any recovery by it from the telegraph company; the essen-
tial condition precedent to the right of such recovery would be a
valid contract with reference to "Sparks' Best" flour between the
milling company and Smyth & Co. *Western Union Tel. Co.* v.
*Bailey,* 115 *Ga.* 725 (42 S. E. 89) ; *Beck & Gregg Hardware Co.* v.
*Knight,* 121 *Ga.* 287, 292; *Haber-Blum-Bloch Hat Co.* v. *Southern
Bell Tel. Co.,* 118 *Ga.* 874 (69 S. E. 481); *Richmond Hosiery
Mills* v. *Telegraph Co.,* 123 *Ga.* 216 (51 S. E. 290) ; *Bass* v. *Postal
Tel. Co.,* 127 *Ga.* 426 (45 S. E. 696). Certainly it can not be
reasonably contended that the milling company was legally bound
to Smyth & Co. to sell them the 3,000 sacks of "Sparks' Best"
flour at 23-6 shillings per sack, when the milling company had not
accepted Smyth & Co.'s offer and had made them a counter propo-
sition which had never been received. This liability could only be
claimed upon the assumption that the interpretation which Smyth
& Co. placed upon the confirmatory cablegram relating to the
"Armadale" transaction was a reasonable and necessary construc-
tion, and was caused by the negligent conduct of the defendant com-
pany, as alleged. While the allegation is that if this confirmatory
cablegram referring to the "Armadale" transaction had been de-
livered within a reasonable time to Smyth & Co., they would have
discovered from it that it referred to the "Armadale" transaction,
and not to the "Sparks' Best" transaction, yet it is seen that when

the cablegram was actually delivered, notwithstanding its express terms, they construed it as referring to the "Sparks' Best" transaction, and as an acceptance of their offer to purchase 3,000 sacks of the latter brand of flour.

This whole case, it seems to us, lies in a very narrow compass, and may be comprehensively stated as follows: There were two transactions between the milling company and their correspondents, Smyth & Co. The first transaction related to the sale of 1,000 sacks of "Armadale" flour at 22 shillings per sack. This contract was completed by the offer contained in the cablegram sent by the milling company to Smyth & Co., and accepted by Smyth & Co. in their reply cablegram. The third or confirmatory cablegram, which was sent by the milling company to Smyth & Co., was wholly unnecessary; for, the contract having been completed by the offer and acceptance above stated, no confirmation was necessary. Even, therefore, if the terms of the confirmatory cablegram bore out the contention that Smyth & Co. necessarily construed it, in the absence of any reply to their offer to purchase 3,000 sacks of "Sparks' Best" flour, as a reply to their cablegram and as an acceptance thereof, this erroneous interpretation was caused, not by any negligence of the telegraph company, but by the unnecessary act of the milling company in sending the confirmatory cablegram and in making it possible for the erroneous interpretation to be placed upon it. The offer to purchase 3,000 sacks of "Sparks' Best" flour was not accepted by the milling company, and consequently there existed no contract binding it to sell this flour on the terms proposed by Smyth & Co. If the milling company, notwithstanding that it was not legally bound to sell this flour on the terms proposed, did so, not because of any legal liability, but for the purpose of protecting its credit and standing commercially, this was a mere voluntary act and could not be the basis of a claim for damages against the telegraph company.

2. It is insisted by counsel for the plaintiff that in any event the court erred in sustaining the general demurrer and dismissing the petition, because the plaintiff was at least entitled to have the question of nominal damages passed upon by the jury. We think this contention is unsound for two reasons: In the first place, as we have endeavored to show, we do not think that the plaintiff has the right to recover any sort of damages from the telegraph

company; and in the next place, the suit is limited to a claim for special damages, arising under the circumstances set out in the petition. There is no suit for general damages or nominal damages; and, under such allegations, only the character of damages sued for could be recovered. In other words, there can be no recovery for either nominal or general damages where the suit is exclusively one to recover special damages. *Christophulos Café Co.* v. *Phillips,* 4 *Ga. App.* 819 (2), (62 S. E. 562); *Wright* v. *Smith,* 128 *Ga.* 432 (57 S. E. 684).

*Judgment affirmed.*